**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**


**DEREK A.  WYATT**                                                    **APPELLANT**

**vs.**                                    **CIVIL ACTION NO. 3:10-cv-000436-HTW-LRA**
                                           **(CONSOLIDATED WITH)**
                                           **CIVIL ACTION NO. 3:10-cv-000449-DPJ-FKB**

**MARY E. McALISTER**                                                   **APPELLEE**

_____

**ON APPEAL FROM**
**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**


**IN RE:**

**WYATT & McALISTER, PLLC**                              **CASE NO.09-04354-EE**
                                                         **CHAPTER 7**


*********************

**APPELLANT BRIEF OF DEREK A. WYATT**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................... 2

TABLE OF AUTHORITIES ............................................................. 3

STATEMENT REGARDING ORAL ARGUMENT .......................................... 7

STATEMENT OF BASIS OF APPELLATE JURISDICTION .......................... 7

STATEMENT OF ISSUES PRESENTED ........................................................ 9

STATEMENT OF STANDARD OF APPELLATE REVIEW ........................... 11

STATEMENT OF THE CASE ........................................................... 11

STATEMENT OF RELEVANT FACTS ........................................... 23

SUMMARY OF THE ARGUMENT .................................................. 35

ARGUMENT ................................................................. 35

No provision of the Bankruptcy Code in effect as of December 10, 2009,
required specific authorization or voting procedures for an
LLC to file bankruptcy ............................................................ 35

No provision of the Ms LLC Act in effect as of December 10, 2009,
required specific authorization or voting procedures for an LLC to file
bankruptcy.................................................................... 35

The Bankruptcy Court erred in interpreting the phrase "a member has
no power to withdraw" to meaning it is factually impossible for a
member to consummate a Section 307(3) withdrawal........................... 38

By her actions leading up separation from W&M, and under common
law principles defining conflict of interests, McAlister is estopped
from exercising authority or control over W&M. ................................... 38

The Bankruptcy Court erred when it failed to find that McAlister breached
(i) the duties placed on her by section 79-29-402(1)(a)(b)(c) of the LLC act;
(ii) a fiduciary duty owed to W&M and Wyatt; and (iii) a duty of loyalty
owed to W&M and Wyatt ........................................................ 38

CONCLUSION .................................................................. 48

## TABLE OF AUHTORITIES

CASES

*Anderson v. Lambert*,
494 So. 2d 370, **10 (Miss. 1986) ............................................................   15

*Ellzey v. Fyr-pruf, Inc.*,
376 So. 2d 1328 (Miss. 1979) ...................................................................   39

*Home Telephone Company v. Darley et al*,
355 F. Supp 992 (N.D. Miss. 1973)............................................................   44-47

*Huntington Nat'l Bank v. Big Sky Dev. Flint LLC*,
2010 U.S. Dist. LEXIS 64116 ....................................................................   13

*In re American Mariner Indus.*,
734 F.2d 426, 432 (9th Cir. Cal. 1984)......................................................   45

*In re Delta Starr Broadcasting, L.L.C.*,
2006 U.S. Dist. LEXIS 4477 .......................................................................   13

*In the Matter of Northlake Development, L.L.C., Debtor;*
*Kinwood Capital Group, L.L.C.; George Kiniyalocts, Individually*
*and  as General Partner of Kiniyalocts Family PTRS. I, Ltd. v. Bankplus*,
614 F.3d 140; 2010 U.S. App. LEXIS 16114 (5th Cir. 2010) ..................   8

*Jones v. GMC*,
2007 U.S. District LEXIS 40267 (S.D. 2007) ............................................   37

*Kumar vs. Kumar, individually and as manager of Mit-Sar, L.L.C.*,
2009 U.S. Dist. LEXIS 26708, (N.D. Miss. 2009)......................................   17-42

*Mid-Continent Telephone Corporation v. Home Telephone Company et al*,
319 F. Supp. 1176 (N.D. Miss. 1970)..........................................................   44

*Mississippi Gaming Comm'n. v. Imperial Palace of Mississippi*,
751 So.2d 1025, 1028 **8 (Miss. 1999) ...................................................   15,38

*Omni Bank v. United Southern Bank*,
607 So. 2d 76 (Miss. 1993) .........................................................................   39

*Plunk v. Yaquinto (In re Plunk)*,
481 F.3d 302, 305 (5th Cir. 2007) .............................................................   11

*Rachlin Cohen & Holtz, LLP v. Mirabils Ventures, Inc. (In re Mirabilis Ventures, Inc.)*,

2010 WL 1644915, at *3, 6 (M.D. Fla. Apr. 21, 2010) .......................................   18

*Thorpe v. Levenfeld*,
2005 U.S. Dist. LEXIS 22050 ...............................................................   13

*Gilliam v. Speier* (*In re KRSM Props., LLC*),
318 Bankr. 712, 717 (B.A.P. 9th Cir. 2004) ..................................   36

*In re Calhoun*,
312 Bankr. 380, 383 (Bankr. N.D. Iowa 2004) ...........................   36

*In re ICLNDS Notes Acquisition, LLC*,
259 Bankr. 289 (Bankr. N.D. Ohio 2001) ..................................   36

*ERA Franchise Sys. v. Mathis*,
931 So.2d 1278, 1281 (Miss. 2006) ............................................   39, 41

*Derouen v. Murray*,
604 So. 2d 1086, 1090-91 (Miss. 1992) .......................................   39, 44

*In re Wyatt & McAlister, PLLC*,
Case No. 90-cv-0090-B, Chancery Court of
Madison County, Mississippi ........................................................   35

*Knox Glass Bottle Co. v. Underwood*,
228 Miss. 699, 89 So.2d 799, 814 (1956) ....................................   44

*Cooper v. Mississippi Land Co.*,
220 So.2d 302 (Miss. 1969) ..........................................................   44

## STATUTES AND OTHER AUTHORITIES

11 U.S.C. § 301 ..............................................................................   13

28 U.S.C. § 105 ..............................................................................   67

28 U.S.C. § 157 ..............................................................................   7

28 U.S.C. § 158 ..............................................................................   7

28 U.S.C. § 158(a) .........................................................................   7

28 U.S.C. § 158(d)(2) .....................................................................   7, 8

28 U.S.C. § 158(d)(2)(A) ...............................................................   7, 8

Miss. Code Ann. §§ 79-29-101(1994) *et. seq.* .................................................... 12

Miss. Code Ann. §§ 79-29-101(2010) *et. seq.* .................................................. 12

Miss. Code Ann. § 79-29-103.......................................................................... 13, 20

Miss. Code Ann. § 79-29-103(n)........................................................................ 16

Miss. Code Ann. § 79-29-301 ........................................................................... 23

Miss. Code Ann. § 79-29-302 ....................................................................... 13, 35, 41

Miss. Code Ann. § 79-29-303(1) ..................................................................... 42, 44, 45

Miss. Code Ann. § 79-29-307(3)(Rev. 1997)(tier two)................................. 9,10, 14,

15, 19, 33, 34, 35, 39

Miss. Code Ann. § 79-29-401........................................................................13, 16, 17, 39

Miss. Code Ann. § 79-29-401(7) ....................................................................... 10

Miss. Code Ann. § 79-29-402 ........................................................................... 13

Miss. Code Ann. § 79-29-402(1)(a)(b)(c) ..................................................... 10, 17, 35,

36, 38, 39, 42

Miss. Code Ann. § 79-29-402(4) ....................................................................... 10

Miss Code Ann. § 79-29-801............................................................................. 13

Miss. Code Ann. § 79-29-802............................................................................ 13

Miss. Code Ann. § 79-29-803............................................................................ 13

Miss. Code Ann. § 79-29-803(1) .................................................................... 10

Miss. R. App. P. 20 .......................................................................................... 8

Bankruptcy Rule 8012 ..................................................................................... 7

Bankruptcy Rule 8013...................................................................................... 11

*Jackson & Miller*, 49.29 .................................................................................... 35

*Jackson & Miller*, 49.30 ……………………………………………………   17, 35, 36, 37, 38,

Larry E. Ribstein & Robert R. Keatinge,
*Ribstein & Keatinge on Limited Liability Companies* (2000) ………………..   33

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Bankruptcy Rule 8012, Appellant submits that oral argument would significantly advance the decisional process because the Bankruptcy Court's decision has far-reaching implications for Mississippi limited liability companies ("LLC's")[1] and those who do business with them.  Secondly, the pivotal authority-to-file issue ruled on by the Bankruptcy Court is an issue of first impression in Mississippi, relegated exclusively to interpretation of certain LLC statutes never before construed by the Mississippi Supreme Court or Court of Appeal.  Creating new precedent, the Bankruptcy Court's interpretation and ruling on pure state law issues, has been substituted for that of the Mississippi Supreme Court and Court of Appeal.

## STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The Court's appellate jurisdiction in this matter is based on 28 U.S.C. § 158(a), which in pertinent part states: "The district courts of the United States shall have jurisdiction to hear appeals from (1) final judgments, orders, and decrees [. . .] of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under [28 U.S.C. § 157]."  28 U.S.C. § 158.

Also, within exercise of its appellate jurisdiction, the District Court may on its own motion certify this case under 28 U.S.C. § 158(d)(2) to the 5th Circuit Court of Appeals if it finds any one of three circumstances apply under 28 U.S.C. § 158(d)(2)(A):

---

[1] Whether "an LLC" or "a LLC" is the grammatically correct form, is unclear.  This Brief will follow *Ribstein & Keatinge on Limited Liability Companies*, (12/2003), and use "an LLC."

(i)     the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

(ii)    the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

(iii)   an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken;

*Id.*

If the 5th Circuit accepts the motion for direct appeal, it would then be vested with appellate jurisdiction and capable of certifying a question of state law to the Mississippi Supreme Court.[2]  *See* 28 U.S.C. § 158(d)(2); Miss. R. App. P. 20.

Notably, a bankruptcy case recently appealed from this Court to the 5th Circuit, concerning a pivotal state law issue in the context of an LLC, resulted in the 5th Circuit certifying a question to the Mississippi Supreme Court.  *See In the Matter of Northlake Development, L.L.C., Debtor; Kinwood Capital Group, L.L.C.; George Kiniyalocts, Individually and as General Partner of Kiniyalocts Family PTRS. I, Ltd. v. Bankplus,* 614 F.3d 140; 2010 U.S. App. LEXIS 16114 (5th Cir. 2010).

Appellant respectfully suggests that *In re Wyatt & McAlister* is particularly well-suited for direct appeal to the 5th Circuit because the Bankruptcy Court's interpretation of the *Mississippi Limited Liability Company Act*, involving state law

---

[2] Neither federal nor state procedural rules allow a bankruptcy or district court in Mississippi to certify even a care-dispositive question of state law to the Mississippi Supreme Court.  The only way to channel a state law question to the Mississippi Supreme Court is by 5th Circuit certification.  *See* Miss. R. App. P. 20.

questions of first impression, are then eligible for certification to the Mississippi Supreme Court.

## STATEMENT OF THE ISSUES PRESENTED

The issues presented for review in this appeal, as derived from the Bankruptcy Court's Findings of Fact and Conclusions of Law ("Fact Findings and Conclusions") [Dkt. 88] and Final Judgment Granting in Part the Motion to Dismiss ("Final Judgment")[Dkt. 89], are as follows:

(1) whether any provision of the Bankruptcy Code in effect as of December 10, 2009, required specific authorization or voting procedures for an LLC to file bankruptcy;

(2) whether any provision of the Ms LLC Act in effect as of December 10, 2009, required specific authorization or voting procedures for an LLC to file bankruptcy;

(3) whether the statement "a member has no power to withdraw" as used in Section 79-29-307(3),[3] is intended to mean it is factually impossible for a member to consummate a withdrawal, because in the language of the statute, they lack "power;"

(4) whether Section 79-29-307(3)[4] makes it unlawful for a member to resign in whole or part from an LLC prior to lawful dissolution, unless the LLC members

---

[3] For brevity and ease of reference in this Brief, discussion of this statutory passage will be referred to as a "Section 307(3)" withdrawal.  As in effect on January 9, 2009, and applicable to a "tier two" LLC, the full statutory citation is Miss. Code Ann. § 79-29-307(3)(Rev. 1997)(tier two).

[4] *Id.*

voted to approve or authorized resignation in a certificate of formation ("COF") or limited liability company agreement ("operating agreement);[5]

(5) whether within the context of Section 79-29-307(3),[6] withdrawal by a member is "[dissociation] from the limited liability company," as provided in the statutory definition of "Member";[7]

(6) whether by analogy to statutory wind-up procedures under Section 79-29-803(1), a person who has engaged in wrongful dissolution of an LLC is statutorily barred from contesting liquidation of an LLC under a Chapter 7 Bankruptcy proceeding;

(7) whether the signing of a petition in bankruptcy is within the scope of Section 79-29-402(4), stating that a person acting as member-manager of an LLC cannot be held liable for "any action taken as a manager, or any failure to take any action," when the performance of his member-manager duties complies with the standards of conduct prescribed by Section 79-29-402(1)(a)(b)(c);

(8) whether the signing of a petition in bankruptcy is within the scope of Section 79-29-401(7), stating that a person acting as member-manager of an LLC, unless restricted by a COF or operating agreement, has legal authority to take "any action required or permitted;"

---

[5] "Operating agreement" is the short hand phrase for "limited liability company agreement," the formal statutory name.  "Limited liability company agreement" is a defined term under the Act.  *See*, Miss. Code Ann. § 79-29-103(k).

[6] *See* ftn. 3, *supra.*

[7] Miss. Code Ann. § 79-29-103(n)(Rev. 2000).

(9) whether under legal or equitable principles, McAlister is estopped from claiming a right of veto power over W&M's affairs,[8] when (1) the facts, circumstances and agreements giving rise to W&M's formation; (2) the factual events leading up McAlister's separation from W&M; and (3) the legal effect of McAlister's abandonment of W&M eleven (11) months prior to Petition filing, constitute acts of wrongful dissolution;

(10) whether the Bankruptcy Court erred by failing to apply the Mississippi law of fiduciary duty and duty of loyalty applicable to members in a closely-held limited liability company;

(11) whether the Bankruptcy Court failed to interpret the Ms LLC Act in accordance with legislative policy and applicable rules of construction, mandated by Mississippi Supreme Court precedent.

## <u>STATEMENT OF THE STANDARD OF APPELLATE REVIEW</u>

This Court must review the Bankruptcy Court's findings of facts for clear error and must consider the Bankruptcy Court's conclusions of law *de novo. Plunk v. Yaquinto* (*In re Plunk*), 481 F.3d 302, 305 (5th Cir. 2007); *see also*, Bankruptcy Rule 8013.

## <u>STATEMENT OF THE CASE</u>

Mississippi passed its first LLC Act in 1994 by enacting the *Mississippi Limited Liability Company Act* ("Ms LLC Act"), effective from and after July 1, 1994.  Miss.

---

[8]  Originally structured as a two-member LLC, each owning 50%, W&M falls into the category of a "deadlocked LLC."  Neither having a majority interest, no action can be taken by either member, unless the other goes along and approves.

Code Ann. §§ 79-29-101(1994) *et. seq*.  Though not applicable to this appeal,[9] the 1994 Act was repealed in 2010 by passage of the *Revised Mississippi Limited Liability Act* ("Rev. Ms LLC Act"), effective from and after January 1, 2011.  Miss. Code Ann. §§ 79-29-101(Rev. 2010) *et. seq*.

The subject of this appeal is the Bankruptcy Court's interpretation of the Ms LLC Act (1994), applied as of December 10, 2009, to W&M PLLC and the persons authorized at that time to file a Chapter 7 Petition (the "Petition") in Bankruptcy, on W&M's behalf.  (Dkt. No. 1).

By filing a Certificate of Formation ("COF"), W&M PLLC was formed as a professional limited liability company ("PLLC") on September 22, 2008.  (Tr. Ex. D-1).  The COF signed by "Derek Wyatt" and "Mary McAlister," identified them as "Partner[s]," but was silent as to ownership percentages.  (Tr. Ex. D-1).  However, as originally formed, neither Wyatt nor McAlister dispute that each possessed a 50% membership interest in W&M. (Dkt. No. 88).

W&M did not adopt an operating agreement, elect to vest management in a manager or managers per question six of the COF, or add any special provisions to the COF form it filed with the Secretary of State.  (Tr. Ex. D-1).  Consequently, by "default" application of the Act, W&M at all times operated as a member-managed LLC,[10] governed solely by the provisions of the LLC Act as written.  *See* Miss. Code

---

[9] The Bankruptcy proceeding was commenced December 10, 2009, before the "mandatory application date" of the Rev. Ms LLC Act.  (Dkt. No.1).  The Rev. Act does not apply to "an action or proceeding" commenced before the "mandatory application date."  Miss. Code Ann. § 79-29-1317(Rev.2010); Miss. Code Ann. § 79-29-1309 (Rev.2010).

[10] By operation of statute, management of a default LLC, i.e., one having no provision in its COF naming a manager or managers and no operating agreement, is "vested in its members."  Miss. Code Ann. § 79-29-302.

Ann. § 79-29-302; *see e.g., Thorpe v. Levenfeld*, 2005 U.S. Dist. LEXIS 22050 **11 (stating the "Illinois Limited Liability Company Act ("ILLCA") creates default rules but allows limited liability companies to contract around many of the provisions . . . "); *In re Delta Starr Broadcasting, L.L.C.*, 2006 U.S. Dist. LEXIS 4477 *9 (referring to the "default provisions" of the Louisiana LLC law"); and *Huntington Nat'l Bank v. Big Sky Dev. Flint LLC*, 2010 U.S. Dist. LEXIS 64116 *16 (stating "the Michigan Limited Liability Act provides default rules concerning . . .").

The pivotal issues in this case relate to interpretation of eight statutes found in the Act: "Definitions" § 79-29-103; "Management of limited liability company" § 79-29-302; "Events of dissociation" § 79-29-307 (Rev. 1997) (tier two); "Management of a limited liability company by manager or managers" § 79-29-401; "General standards of conduct for a manager" § 79-29-402; "Nonjudicial dissolution" § 79-29-801; "Judicial dissolution" § 79-29-802; and "Winding up" § 79-29-803.

Originally structured as a 50/50 two-member LLC, in management affairs W&M was pre-disposed to deadlock.  In practical effect, because neither 50% can act without approval of the other, in a 50/50 structure the fractional interest of each member is immaterial, except in the sense that it vests each member with a power of veto.  The Bankruptcy Court adopted this construction and applied it in formulaic fashion to the authority-to-file issue in this case, finding that Wyatt failed to obtain McAlister's 50% approval before filing.  (Dkt. No. 88; Dkt. No. 89).  (Inexplicably, the Bankruptcy Court ignored member approval when it reached the conclusion that

McAlister could detach from W&M by resigning employment, leaving her member interest unaffected.)

In reaching this result, the Court adopted without qualification three premises asserted by McAlister.  First, that she intended to resign, not withdraw, and her intention controlled how her actions were to be construed.  Secondly, by resigning, the right to vote as a 50% member, was unaffected.  Thirdly, assuming *arguendo* McAlister was attempting to withdraw by her letter of resignation, the issue is moot because the language of the applicable statute, "a member has no power," makes it impossible to consummate a withdrawal.[11]

The third premise of the Bankruptcy Court's ruling is the linchpin in this case. If the Bankruptcy Court's interpretation of law fails to withstand scrutiny under this Court's *de novo* standard of review, the decision is reversible as a matter of law. Simply stated, if the phrase "a member has no power to withdraw,"[12] cannot be construed to mean it is impossible for a member to consummate a Section 307(3) withdrawal, the Bankruptcy Court's interpretation cannot stand.

There are several approaches to the authority-to-file issue, given the factual context of this case.  One is to focus attention on the person who filed, to the exclusion of all else.  An alternative is to focus attention the on the person who challenged.  Here, the Bankrupt Court chose to focus solely on Wyatt's status as a 50% member, and decided the authority-to-file issue with formulaic reasoning:

---

[11] The language the Court relied on is "a member has no power to withdraw," contained in Section 79-29-307(3)(Rev. 1997)(tier two).

[12] *Id.*

Wyatt had 50%, McAlister 50%, a vote was required, McAlister votes "no," therefore Wyatt lacked authority to act for the LLC. (Dkt. No. 88; Dkt. No. 89).

The Court might just as easily have focused on McAlister, and applying the same formula, asked whether resigning her employment required Wyatt's approval. Nonetheless, applying the Court's reasoning process, if the phrase "a member has no power" means it is impossible to consummate a Section 307(3) withdrawal, then resignation, even if unauthorized, is equally of no effect.  In either case, the result falls within the absurd results doctrine.[13] *See Mississippi Gaming Comm'n. v. Imperial Palace of Mississippi*, 751 So.2d 1025, 1028 **8 (Miss. 1999) (Courts have a duty "to support a construction which would purge the legislative purpose of any invalidity, absurdity or unjust inequality.")  McAlister's voting rights remain unaffected, the LLC and its members are without remedy, and McAlister is wholly unaccountable.

In practical effect, the Bankruptcy Court's Fact Findings and Conclusions, hold that McAlister has plenary power to veto the Bankruptcy filing, and future actions of Wyatt in his capacity as member-manager, which McAlister cares to disapprove.  (Dkt. No. 88).  If according to the Bankruptcy Court, a person can detach from a default LLC by merely designating their severance a "resignation," with no consequent effect on membership interests, in the case of a 50/50 LLC such as W&M, the remaining member's voting rights are neutered by the absentee's veto power, placing plenary control of the LLC in the hands of an estranged, unaffiliated

---

[13] *See e.g.*, *Anderson v Lambert*, 494 So. 2d 370, **10 (Miss. 1986), wherein the Mississippi Supreme the Court stated: ". . . we reiterate a well-settled rule in Mississippi regarding statutory construction: 'Unthought of results must be avoided if possible, especially if injustice follows, and unwise purpose will not be imputed to the Legislature when a reasonable construction is possible.'"

person.  In practical effect, the Bankruptcy Court cancelled Wyatt's LLC interest by judicial fiat.

Placing the focus where Appellant contends it belongs, this Brief will discuss three critical fact scenarios impacting the authority-to-file issue: (1) the facts, circumstances and agreements giving rise to W&M's formation; (2) the factual events leading up McAlister's defection from W&M on January 9, 2009; and (3) the legal effect of McAlister's defection and abandonment of W&M three hundred thirty-five (335) days prior to the Bankruptcy filing.  The conclusions drawn from these inquiries determine whether McAlister dissociated or unlawfully withdrew from W&M three hundred and thirty-five (335) days prior to the Chapter 7 Petition being filed, or alternatively is estopped from contesting the Bankrutpcy filing by her actions and conduct.

In this connection, the LLC Act defines a "[m]ember" as a person who was admitted per § 79-29-301 "and that has not dissociated" from the LLC.  Miss Code Ann. § 79-29-103(n).  The Act does not define the term "dissociated," but includes a statute listing various "[e]vents of dissociation" that result in terminated membership.  Miss. Code Ann. § 79-29-307 (Rev. 1997)(tier two).

Article 4 of the Ms LLC Act entitled "Management," prescribes the standards of conduct for persons exercising management duties in an LLC.  Miss Code Ann. § 79-29-401.   Prior to McAlister's separation, as 50% member-managers, both members were at all times subject to a statutory standard of conduct requiring that their management duties be discharged in "good faith," with the care of an "ordinarily prudent person" in like position, and in a manner "reasonably believed

to be in the best interest" of the LLC.  Miss. Code Ann. § 79-29-402(1)(a)(b)(c); *see also* Jeffrey Jackson & Mary Miller, Encyclopedia of Mississippi Law § 49.30 (2000); *see e.g.*, *Kumar vs. Kumar, individually and as manager of Mit-Sar, L.L.C.*, 2009 U.S. Dist. LEXIS 26708, (N.D. Miss. 2009).  Per Article 4 of the Act, unless restricted by provisions in the COF or an operating agreement, "any action required or permitted to be taken by managers of [an LLC] may be taken by a majority vote of the managers."  Miss. Code Ann. § 79-29-401(7).

On December 10, 2009, Vann F. Leonard, acting as attorney for W&M, filed a Chapter 7 Petition signed on behalf of W&M, by Derek A. Wyatt, acting member-manager in good standing.  (Dkt No. 1).  Despite having terminated her affiliation with W&M eleven months (335 days) ago, on December 14, 2009, Mary McAlister filed an "Emergency Motion to Dismiss Debtor Wyatt & McAlister, PLLC's Chapter 7 Voluntary Petition" ("McAlister's Motion to Dismiss"), requesting dismissal and sanctions against Wyatt.  (Tr. Ex. P-2; Dkt. No. 6).

On January 27, 2010, as an interested party filer, and on behalf of W&M, Wyatt filed an "Objection and Response to the Motion to Dismiss," along with an Affidavit attaching documents from W&M's files and records, marked as Exhibits 1-6.  (Dkt. No. 43).

On March 5, 2010, the Bankruptcy Court conducted what it referred to as a "trial" on McAlister's Motion to Dismiss. (Dkt. No. 120, Trial Tr.). As movant, McAlister had the burden of proving that she had not dissociated, unlawfully withdrawn or breached the standards of conduct applicable to her as former member-manager, when she separated from W&M eleven (11) months previous to

the Bankruptcy filing. *See Rachlin Cohen & Holtz, LLP v. Mirabilis Ventures, Inc. (In re Mirabilis Ventures, Inc.),* Nos. 6:08-bk-04237-KSJ, et al., 2010 U.S. Dist. LEXIS 48055, 2010 WL 1644915, at *3, 6 (M.D. Fla. Apr. 21, 2010) (affirming the Bankruptcy Court ruling that the movants failed to meet their burden of proof in establishing a basis for dismissal of debtors' bankruptcy cases).

Notwithstanding this burden, McAlister gave no testimony on the record and rested after submitting two documents as Exhibits: W&M's COF; and an alleged "Letter of Resignation," dated January 8, 2009.  (Dkt. No. 120, "Tr. Transcript"; Tr. Exs. P-1 and Tr. Ex. P-2).

In response, W&M and Wyatt submitted trial Exhibits 1-40 consisting of W&M business records, to support their assertion that McAlister had no standing to challenge the filing because eleven (11) months prior the Petition filing, she had dissociated and unlawfully withdrawn from W&M, and breached multiple standards of conduct by purposefully forcing W&M into insolvency and dissolution. (Dkt. No. 120, Tr. Exs. D-1 – D-40).

On March 30, 2010, Wyatt filed a twenty-six page Memorandum of Law opposing McAlister's Motion to Dismiss.  (Dkt. No. 75).  By reference to Exhibits 1-40, Wyatt asserted that McAlister's previous separation from W&M, resulting in termination of W&M's source of funding along with breach and revocation of a key buy-out agreement capitalizing the firm, was purposefully intended to force W&M into insolvency and dissolution.  Further, that eleven (11) months prior to the Petition filing, McAlisiter had dissociated and unlawfully withdrawn from W&M, had breached numerous standards of conduct by purposefully forcing W&M into

insolvency and dissolution, and had no standing to challenge Wyatt's authority to sign W&M's Petition.   On March 30, 2010, W&M also filed an "Opposition to Emergency Motion to Dismiss." (Dkt. No. 74).

On March 30, 2010, McAlister filed a Memorandum "in Support of Motion to Dismiss" denying that she had dissociated or unlawfully withdrawn, claiming that she resigned an employment relationship with W&M on January 8, 2010, and therefore had the retained right as a 50% voting member to veto the Bankruptcy filing.  (Dkt. No. 73).  Alternatively, McAlister asserted that even if she had intended to withdraw, her separation from W&M eleven (11) months previous could not be interpreted as a dissociation or withdrawal because Section 79-29-307(3)[14] provides that "a member has no power to withdraw," (unless authorized by the COF or operating agreement).  (Dkt. No. 73).

On April 23, 2010, the Bankruptcy Court entered Findings of Fact and Conclusions of Law ("Fact Findings and Conclusions") granting McAlister's Motion to Dismiss, and withholding judgment as to the request for attorneys fees and sanctions. (Dkt. No. 88).   The same day, the Court entered a "Final Judgment Granting in Part the Motion to Dismiss Chapter 7 Voluntary Petition," retaining the remaining issue of attorneys fees and sanctions, and dismissed the case.  (Dkt. No. 89).

On May 7, 2010, Wyatt and W&M filed their "Joint Motion for New Trial, to Alter or Amend Judgment, and/or for Relief from Final Judgment," along with a

---

[14] The full citation form for reference to this statute is "Miss. Code Ann. § 79-29-307(3)(Rev. 1997)(tier two)."

supporting memorandum.  (Dkt. No. 94 and Dkt. No. 96; Dkt. No. 95 and Dkt. No. 97). On May 26, 2010, the Bankruptcy Court entered its "Memorandum Opinion and Order Denying Joint Motion for New Trial, to Alter or Amend Judgment, and/or for Relief from Final Judgment."  (Dkt. No. 102).  Timely notices of appeal were filed by W&M on June 9, 2010, and separately by Wyatt as an interested party filer on June 23, 2010.  (Dkt. No. 103 and No. 109).

On November 30, 2010, the District Court ordered the appeals of W&M and Wyatt to be consolidated under civil action number 3:10-cv-00436-HTW-LRA.  (Dkt. TEXT-ONLY ORDER, 11/30/2010).

## STATEMENT OF RELEVANT FACTS

W&M officially began operating as an LLC in November 2008. (Dkt. No. 75, p. R-571).  The firm consisted of the two attorneys, McAlister and Wyatt, acting as member-managers, and three staff employees.  (Dkt. No. 75, p. R-569).

**(1) Facts, Circumstances and Agreements Giving Rise to W&M Formation.**

Prior to forming a law firm with Wyatt in 2008, McAlister worked in law firms owned or controlled by attorney David Nutt ("Nutt"). In late 2005, McAlister and Nutt created the LLC "Nutt & McAlister PLLC" and formed a joint venture ("Katrina venture") with attorney Richard F. "Dickie" Scruggs ("Scruggs").  (Dkt. No. 75, p. R-568 and p.R-569).  Although working with a "Katrina venture" firm, Wyatt did not become associated with Nutt's office until he was hired December 15, 2006, roughly a year after the venture was formed and operating.  However, Wyatt was never a member of Nutt & McAlister.

After Scruggs and others in his firm were convicted, disbarred and sentenced

to federal prison for attempting to bribe the presiding judge in a fee dispute between venture members,[15] Nutt & McAlister, Scruggs and others were disqualified from hundreds of pending cases the Katrina venture had filed.  Nutt later announced that he was getting out of law practice, would shut down and dissolve the Nutt & McAlister firm, and lay off the attorneys and legal support staff employed in his office.  (Dkt. No. 43, p.R-453).

Facing a lay off, and divested of their anticipated earnings from attorney fees in hundreds of pending Katrina cases,[16] McAlister and Wyatt agreed to form their own firm provided Nutt could be persuaded to sell rather than dissolve what little remained of Nutt & McAlister.  (Dkt. No. 43, p.R-453; Tr. Ex. D-2).

With McAlister acting as negotiator for Wyatt and herself, Nutt agreed to a proposal allowing minority member McAlister to buy-out Nutt's interest in Nutt & McAlister, and thereafter effect a name change.  (Tr. Ex. D-2); Dkt. No. 43, supporting exhibit no. 2, p. R-460 – R-463; Tr. Ex. D-3 memo to Brunini; (Tr. Ex. D-4 memo for discussion with Montague).  Nutt proposed to hire the new W&M firm to wrap-up inactive files held by his other two firms, PC and PA.[17]   (Dkt. No. 75, p. R-569).  McAlister and Wyatt agreed to Nutt's proposal, and hired three employees Nutt planned to lay off, to begin Nutt's wrap-up work when W&M opened.   As compensation, Nutt agreed to pay W&M PLLC an hourly rate for all wrap-up work,

---

[15] *United States of America v. Richard F. Scruggs et al,* Criminal Case No. 3:07-CR-000192 NBB.

[16] Nutt & McAlister's venture fee percentage of 32% was to be divided three ways: Nutt (78%); McAlister (18%); and Wyatt (10%).

[17] The PA and PC firms were not included in the buyout agreement, but since Nutt was quitting law practice, he contracted with W&M PLLC to wrap-up his inactive PA and PC files.

to be invoiced monthly.  (Dkt. No. 75, p. R-569; Tr. Ex. D-8 email; Tr. Ex. D-9 invoice to Nutt).

On September 22, 2008, Wyatt and McAlister filed the COF forming W&M. n October 15, 2008, the support staff of Nutt & McAlister was terminated, Wyatt and McAlister were laid off, and the firm was shut down. (Tr. Ex. D-1 COF; Dkt. No.  In November 2008, W&M officially commenced doing business from its newly leased offices.  (Dkt. No. 75, p. 13; Tr. Ex. 14-A, announcement; Tr. Ex. 5, email).

McAlister agreed to fund[18] the new firm until it developed a cash flow sufficient to self-fund and made regular monthly capital contributions of $25,000.00 to W&M's operating account to cover expenses such as the salaries and overhead for the three employees.  (Dkt. No. 43, p. R-453 and Supporting Exhibit no. 4, p. R-465); Tr. Ex. 6 "Recap").   Though not obligated to capitalize the firm, Wyatt voluntarily deposited a capital contribution of $24,430.07 derived from the net proceeds of a settlement fee predating, and wholly unrelated to W&M PLLC. (Tr. Ex. D-7, deposit receipt).[19]

**(2) Factual Events Leading Up to McAlister's Defection on January 9, 2009.**

According to the firm's bank statements, in its first two months of operation, W&M expended approximately $85,856.91 in start-up costs. (Tr. Ex. D-13, email; Tr. Ex. D-14, moving invoice; Dkt. No. 75, p. R-570; Tr. Ex. D-11, equipment lease).

---

[18] McAlister was not lacking for capital.  The two-member Nutt & McAlister firm received gross Katrina fees exceeding 18 million dollars in 2007 alone.  (Dkt No. 43, p. R-453).

[19] During a March 17, 2009, Chancery Court hearing, McAlister's attorney falsely represented to the presiding Chancellor: " . . .Wyatt has not contributed any [capital to W&M]." (Tr. Ex.. 31, transcript, p. 5).

However, as agreed in the buy-out agreement[20], W&M PLLC started wrap-up work on Nutt's PC and PA files and by November 30, 2008, W&M had performed hourly wrap-up work totaling $12,377.82 on Nutt's PC and PA files.  (Tr. Ex. D-15, p. 30-33 W&M bill to Nutt;  Tr. Ex. D-9, first W&M PLLC bill to Nutt).

Following a period of exchanging asset lists and Nutt & McAlister financials, McAlister informed Wyatt that it appeared that the buyout consideration to Nutt would be between five and ten thousand ($5,000 - $10,000) dollars. (Dkt. No. 75, p. R-571, FN. 15; (Dkt. No. 75, p. R-571; Tr. Ex. D-15, pgs. 3-17 and 20-25 composite; Tr. Ex. D-15, p. 27 and p. 28 email messages; email p. 27 stating: "Derek, attached is a list of questions for Ernie derived from the 2008 transaction history.  Please add issues to it as you see fit; Tr. Ex. D-15, composite, p. 18-19). Despite the near completion of the buy-out, one unresolved issue remained.

**(a) Past Accrued Fees Owed to Wyatt from the Katrina Venture.**

At the time W&M was formed, Wyatt had not been fully paid for the shared attorney fees earned and accrued during his twenty-two (22) month association with Nutt, McAlister, and their law firms. (Tr. Ex. D-18, letter; Tr. Ex. D-18, letter). On November 20, 2008, Wyatt wrote a letter to Ernie Coward ("Coward') the CFO at Nutt's office to inquire about the outstanding fees and copied McAlister.  (Tr. Ex. D-18, letter).  When a month passed without any response, Wyatt wrote a second letter dated December 19, 2008, again copying McAlister. (Tr. Ex. D-19, letter).

---

[20]Due to the fact that internal accounting records for Nutt & McAlister were not readily available at the time of the move, the assets of Nutt & McAlister were transferred to W&M PLLC on October 31, 2008, even though the purchase of Nutt's majority interest was not completed.  (Dkt. No. 75, p. R-570 and R-571).  Three days prior, McAlister made reference to this in an email to Nutt's office entitled: "The Big Move."  (Tr. Ex. D-13, email).

Though unknown to Wyatt at the time, after McAlister separated from W&M on January 9, 2009, a document was discovered on W&M's server showing that four days after Wyatt's second letter, McAlister had talked with Nutt's CFO Coward, and prepared a memo of their conversation. (Tr. Ex. D-20, memo).  In pertinent part, McAlister's memo stated:

> Ernie called me [. . .] about DW's demand letter [. . .].  By Ernie's calculations, N&M has about $71-73,000 to offer DW, assuming we retrieve our interest in the 2 CDs [. . .]. I brought up [sic] issue of N&M having paid all legal bills for Maria Brown and Doug Mercier.  Ernie indicated he does not want to divide those bills among PA, PC and N&M as it 'would increase the amount that Derek would receive.'
>
> . . .
>
> [. . .] DW fully understood and admitted to me on numerous occasions that he is entitled to 10% of NET fees [. . .] I'm going to record him making that admission.

(Tr. Ex. D-20, memo).

The memo proved not only that McAlister and Coward admitted fees were owed to Wyatt, (though no where near the amounts actually due),[21] but more importantly, confirmed that the discussion included falsifying accounting records, and secretly tape recording Wyatt.  (Tr. Ex. D-20, memo).

McAlister and Coward knew the legal bills for the Maria Brown and Doug Mercier lawsuits were improperly booked 100% to Nutt & McAlister.  (Tr. Ex. D-20 memo).   Before Wyatt's letters, both had agreed these accounting items needed to be pro rated to Nutt's PC and PA firms.  (Tr. Ex. D-21 memo stating: "Ernie needs to adjust the allocation of defense costs for the Maria Brown and

---

[21] The $71-73,000 figure mentioned in McAlister's secret memo bears no rational relation to the total actually owed to Wyatt.

Doug Mercier lawsuits to PC and PA as we previously discussed."). McAlister's memo stated that Coward "[did] not want to divide those bills among PA, PC and N&M as it 'would increase the amount that Derek would receive.'" (Tr. Ex. D-20).

As of January 9, 2009, the date McAlister separated, no response had been made to Wyatt's fee inquiry letters, nor was Wyatt aware of the memo or conversation between McAlister and Coward.

As it turned out, Wyatt was unaware of other events taking place as well.

**(b) Avandia Cases Transferred to W&M Under the Buy-Out Agreement.**

Pursuant to the buy-out agreement, a number of potential Avandia claims were transferred from Nutt & McAlister to W&M, which at the time were of no discernible value. (Tr. Ex. D-4, memo, p. 2, item 3c; Tr. Ex. D-35, email, p. 1; Tr. Ex. D-36 case code sheet; Tr. Ex. D-37, email and draft Avandia letter). After W&M opened for business, McAlister and Wyatt began work to evaluate and develop the Avandia claims for referral to a larger Alabama firm specializing in mass tort drug litigation.[22] To accomplish this, McAlister instructed W&M's staff to get copies of the Beasley-Allen firm's joint retainer contracts and referral packets so that a cover letter, joint retainer and referral packet could be sent to W&M's Avandia clients. (Tr. Ex. D-37, email, p. 1).

On November 20, 2008, McAlister sent an email to Wyatt and W&M staff concerning the Avandia cases. McAlister attached to a draft letter she proposed

---

[22] At one point, McAlister feared the Avandia claims had been mistakenly contracted through Nutt's PC or PA firms, and thus excluded from W&M's buy-out and name change agreement. A W&M employee confirmed that the claims were never contracted through PC or PA. In a reply email, McAlister remarked "Whew, I'm relieved we did use N&M contracts." (Tr. Ex. D-35, email).

to send from W&M to dozens of Avandia clients. The draft letter, to be sent on W&M letterhead, advised the Avandia clients: "*Please note that we are in the process of dissolving Nutt & McAlister, and have formed Wyatt & McAlister, PLLC which is handling the Avandia litigation in association with the law firm of Beasley, Allen, Crow, Methvin, Portis & Miles, PC of Montgomery, Alabama.*" (Tr. Ex. D-37, email and draft letter). (Italics added).  McAlister's email called Wyatt's attention to the passage quoted above, and stated: "Derek, please look carefully at how I phrased the transition of N&M to W&M." (Tr. Ex. D-37, email p. 1).

The following day W&M mailed the Beasley-Allen referral packets and joint retainer contracts, which designated Beasley-Allen and Wyatt & McAlister PLLC as jointly retained attorneys for approximately 70 Avandia clients.  (Tr. Ex. D-38, Avandia letters and packets).  The mail-out included W&M's cover letter as drafted by McAlister and reviewed by Wyatt, essentially stating that Nutt & McAlister was being dissolved, and the newly-formed Wyatt & McAlister firm would be handling the clients' Avandia claims. (Tr. Ex. D-38, Avandia letters and packets).  The mail-out included the Beasly-Allen referral packet, and W&M's joint retainer contract with Beasley-Allen, which stated in pertinent part:

> Client hires Beasley-Allen and Wyatt & McAlister to pursue a claim for injuries and damages possibly caused by ingestion of AVANDIA. . . . .
>
> If this agreement is terminated before the case is closed, Client gives Beasley-Allen and Wyatt & McAlister a lien against any subsequent recovery in this case for Beasley-Allen and Wyatt & McAlister's expenses.  If an offer has been negotiated, Beasley-Allen and Wyatt & McAlister will have a lien upon any subsequent recovery equal to 45% of the offer, or an amount to compensate for time and expenses, whichever is greater.

(Tr. Ex. D-38, p. 2).

After the mail-out, on December 16, 2008, McAlister requested a W&M staff member organize the Avandia claims and separate them into file folders. (Tr. Ex. D-35 email).

Though unknown to Wyatt at the time McAlister separated from W&M on January 9, 2009, documents were later discovered on W&M's server showing that three days prior to her separation from W&M, McAlister had covertly emailed W&M staff members and instructed them to hurriedly refer seven of the Avandia files to the Beasley-Allen law firm making it appear that the referrals came from Nutt & McAlister firm. (Tr. Ex. D-40 Avandia referral letters; Tr. Ex. D-38 W&M PLLC Avandia letters and packets).   Probing further, Wyatt discovered documents showing that on Monday January 5, 2008, four days prior to her separation, McAlister covertly emailed W&M staff members and directed that they rush out referrals of the remaining Avandia files, again using Nutt & McAlister letterhead as the referring law firm.  (Tr. Ex. D-39 email).

**(c) Alteration of W&M Accounting Records.**

As documented in the preceding paragraphs, McAlister pledged to fund W&M until the firm established a cash flow, and could self-fund.  Today, McAlister claims that she made no such commitment or alternatively, that it is not enforceable under Section 79-29-502 of the Act.   However, the business and financial records of W&M contradict McAlister's claim.[23]   For example, on December 29, 2008, W&M's

---

[23] McAlister produced no evidence that she expected or ever called upon Wyatt to fund the firm through capital contributions of his own.

bookkeeper sent McAlister an email showing the bank balance in the firm operating account.  McAlister replied to the email "I'll need to deposit another $25,000 this week." (Tr. Ex. D-22 email).  Argument aside, the business and financial records of W&M confirm that McAlister made three consecutive monthly deposits of $25,000 to W&M's operating account, which were booked as "capital contributions." (Tr. Ex. D-6 Recap).

Though unknown to Wyatt when McAlister tendered her "resignation" letter on January 8, 2009, after her separation from W&M, documents were discovered on W&M's server showing that three days prior to her separation, without Wyatt's knowledge or consent, McAlister sent an email to W&M's bookkeeper instructing her to change three capital contributions totaling $75,000.00 "loans." (Tr. Ex. D-23, p. 1).  Without telling Wyatt, the bookkeeper altered the accounting records three days prior to McAlister's separation, reclassifying the capital contributions as loans from McAlister. (Tr. Ex. D-23, p. 1).  No loan documents existed in connection with the three capital contributions.

**(d) W&M's $400,000 Life Insurance Policy.**

When W&M was formed, Wyatt[24] and McAlister agreed to purchase key man life insurance policies, and designate W&M as owner and beneficiary.  McAlister already had a policy for $400,000 coverage, which in furtherance of the agreement, was changed to designate W&M as owner and beneficiary.  (Tr. Ex. D-34, p. 4).

---

[24] Wyatt made application for his policy but after a lengthy waiting period, the application was declined. before Wyatt could reapply through an alternate carrier, the dispute over Wyatt's past accrued fees came to center stage.

Though unknown to Wyatt when McAlister tendered her "resignation" letter on January 8, 2009, after her separation, documents were discovered on the firm's server showing that five days prior to her separation, McAlister covertly contacted the agent handling W&M's policy, and without Wyatt's consent or knowledge, tried to change the ownership and beneficiary under the policy to herself.  (Tr. Ex. D-34, agent letter; Tr. Ex. D-33, email).  Wyatt discovered that the agent correctly informed McAlister that she could not change the policy owner and beneficiary from W&M to herself.

**(e) Blocking Wyatt's Access to W&M's Server.**

On January 6, 2009, three days before McAlister's separation from W&M, McAlister contacted W&M's computer technicians—the same company under contract to Nutt's office—and without Wyatt's knowledge or consent instructed the technicians to terminate Wyatt's access to the W&M's computer system. (Tr. Ex. D-24 email stating "the block was put on here").  When Wyatt discovered this, he confronted McAlister and warned that she was in violation of her fiduciary duty as a member-manager of W&M PLLC. (Tr. Ex. D-16 email).

**(e) Seizure of W&M Files and Records.**

Without Wyatt's knowledge, McAlister planned to have workers from Nutt's office seize W&M's files and remove them to Nutt's office on January 9, 2009, the effective date of her "resignation."  After sending Wyatt the "Letter of Resignation," McAlister left W&M's office mid-day, having instructed the staff, without Wyatt's knowledge, to stack 90 bankers boxes containing W&M's files, and have them ready for Nutt's workers to seize and remove.  When Wyatt

discovered the plot, he called the Ridgeland Police Department, which intervened intervened and ordered the files be returned to W&M.   In a phone conversation at the scene, the police cautioned McAlister and others in concert with her to cease and desist until civil authorities could properly resolve any issues concerning possession of the W&M files.[25]  (Tr. Ex. D-25 letter; Tr. Ex. D-28 letter; Tr. Ex. D-29 letter).

### (3) The Result and Effect of McAlister's Defection and Abandonment of W&M Three Hundred Thirty-Five (335) Days Prior to The Bankruptcy Filing.

Four days after McAlister's separation, the employees of W&M resigned, leaving Wyatt to singlehandedly manage the affairs of the firm with $1,526.69 in operating funds, $141,000.00 of firm debt, and monthly expenses seriously in arrears.  (Tr. Ex. D-32 letter giving notice of default).  McAlister performed no work, contributed no capital, nor took any part whatsoever in the affairs of W&M during the three hundred thirty-five (335) day period preceding the Bankruptcy filing.  Likewise, McAlister made no effort to resolve the firm's debt crisis resulting from her separation and termination of funding.

### (a) W&M's Bill for $12,377.82 of Work Under the Buy-out Agreement.

On December 15, 2008, W&M sent its first bill to Nutt for wrap-up work performed under the buy-out agreement, documenting in forty-one (41) pages of invoices and time sheets, hourly work totaling $12,377.82 during the period

---

[25] Neither McAlister nor her Brunini attorneys were physically present during the attempted seizure, but both had pre-arranged the file seizure to take place immediately following McAlister's walkout, and monitored the event by cellphone. Attorneys in the Brunini firm who helped orchestrate McAlister's walkout and file seizure, angrily demanded badge numbers when the officers ordered the files returned to W&M.

October 8, 2008, through and inclusive November 30, 2008.[26]  (Tr. Ex. D-9 letter and bill to Nutt).  Additionally, Wyatt estimated that W&M performed $12,000.00 of work under the buy-out agreement between December 1, 2008, and McAlister's separation date, January 9, 2009.  In her role as member-manager of W&M, McAlister never issued a bill to Nutt for this additional work.  When McAlister decided to separate from W&M, terminate its funding, revoke the buy-out agreement and return to her former position with Nutt & McAlsiter, no payment was made for the estimated $24,377.82 of work W&M performed under the buy-out agreement.  The estimated amount exceeded by $10,000.00 or more, the amount McAlister predicted W&M would pay to Nutt under the buy-out agreement. (Dkt. No. 75. p. R-571)

Shortly after McAlister's separation, Wyatt filed a petition in the Chancery Court of Madison County, requesting that the Court issue a decree dissolving W&M.

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court erred in interpreting the Ms LLC Act, committing reversible error.  The actions of McAlister clearly demonstrate her intention was never to resign an alleged employment relationship, but to force the insolvency and wrongful dissolution of W&M.  As such, the Bankruptcy Court was clearly in error when it adopted McAlister's characterization, and failed to apply the full gamut of Mississippi law the issue of authority-to-file issue.

---

[26] Nutt defaulted and never paid W&M PLLC the $12,377.82 he owed. While acting as a member-manager of W&M, McAlister unilaterally, and without Wyatt's knowledge or consent, waived payment of the debt.

## ARGUMENT

- No provision of the Bankruptcy Code in effect as of December 10, 2009, required specific authorization or voting procedures for an LLC to file bankruptcy.

- No provision of the Ms LLC Act in effect as of December 10, 2009, required specific authorization or voting procedures for an LLC to file bankruptcy.

Whatever filing requirements were imposed on W&M by the Bankrupt Court, were derived from sources not found within the Bankruptcy Code or the Ms LLC Act. No specific authorization or voting procedures are required under the Bankruptcy Code for an LLC to file bankruptcy, because the Code does not mention LLC's. Likewise, no specific authorization or voting procedures are required under the Ms LLC Act for an LLC to file bankruptcy. *See generally*, Miss. Code Ann. § 79-29-101 *et. seq.* (1994). According to a leading treatise on LLC's, "[i]t is not clear whether approval of any or all members and an LLC is necessary for commencement of a voluntary case." *Ribstein & Keatinge*, 14:4, p. 14-17 (2004). In voluntary filings, the Bankruptcy Code does not specify requirements for approval by corporations. 11 U.S.C. § 301. The Bankruptcy Code does not address LLC bankruptcy filings.

Although the Bankruptcy Code does not mention LLC's, it is generally accepted that an LLC is a "person" that may qualify for relief as a "debtor" under the Bankruptcy Code. *See Gilliam v. Speier* (*In re KRSM Props., LLC*), 318 Bankr. 712, 717 (B.A.P. 9th Cir. 2004); *In re Calhoun*, 312 Bankr. 380, 383 (Bankr. N.D. Iowa 2004); *In re ICLNDS Notes Acquisition, LLC*, 259 Bankr. 289 (Bankr. N.D. Ohio 2001).

In answering the authority-to-file question, the Bankruptcy Court's ruled that the issue was to be decided by the state law of the LLC's origin. *In re Delta Starr*

*Broadcasting, L.L.C.,* 2006 U.S. Dist. LEXIS 4477.   That being the case, instead of applying the full gamut of state law applicable LLC's and members, the Bankrtupcy Court chose to ignore, when the focus was on McAlister, the law of fiduciary duty, the duty of loyalty, the statutory standards of conduct imposed on member-managers, whether Wyatt had a right of approval, irreconcilable conflicts of interest and a host of overt acts clearly aimed at wrongful dissolution.

- The Bankruptcy Court erred in interpreting the phrase "a member has no power to withdraw" to meaning it is factually impossible for a member to consummate a Section 307(3) withdrawal.

Construing Section 79-29-307(3) statute literally, as the Bankruptcy Court did, the premise that Section 307(3) withdrawal is impossible, must fail if there are circumstances where a member can withdraw, absent authority under a COF or operating agreement.

A careful reading of the Act as a whole yields at least two instances where a member has the power to withdraw, absent authorization by the COF or operating agreement.  First, an LLC interest is assignable, unless restricted by the COF or an operating agreement.  Miss. Code Ann. § 79-29-702.  If a member elects to assign his entire LLC interest, "he ceases to be member." *Id.*  Clearly, an assigning member has the "power" to effect withdrawal, even in the context of a default LLC, where no provision of a COF or operating agreement comes into play.

Secondly, when the right to appraisal attaches to a LLC member's interest, the voluntary exercise of the right terminates a member's interest.  In pertinent part, the appraisal statute states: "once a person deposits that person's certificates, or, in the case of uncertificated interests, returns the executed forms, that member

or owner of a limited liability company interest loses all rights as a member or owner of a limited liability company interest . . ." Miss. Code Ann. § 79-29-214(6)(a)(Rev. 2000). Again, by their own act, member has the "power" to effect withdrawal, even in the context of a default LLC, where no provision of a COF or operating agreement comes into play. *Id.*

The Bankruptcy read Section 79-29-307(3) in isolation, and wrongly interpreted the statute, but more importantly, the Court violated cardinal principles governing statutory interpretation.

A 2007 case from this Court, *Jones v. GMC*, applied the rule of statutory construction holding that courts must avoid interpretations that lead to absurd results, or render the statute meaningless. *Id.* In *Jones*, District Court Judge Dan Jordan wrote:

> A particularly relevant rule of statutory interpretation counsels against "ascrib[ing] to any statute a construction which would make a part of it, in some cases, meaningless and ineffective if another reasonable construction can be found which would give it meaning and effectiveness in all cases within its purview." [citations omitted];
>
> Here, Plaintiff's interpretation of *§11-1-63(h)* essentially nullifies the statute because immunity from product liability claims would be meaningless if the plaintiff could [*8] avoid immunity by merely pleading the same facts as a case for breach of implied warranty. *See Dawson v. Townsend & Sons, Inc., 735 So. 2d 1131, 1140 (Miss. Ct. App. 1999)* (citing *Sheffield v. Reece, 201 Miss. 133, 28 So. 2d 745 (Miss. 1947))* (construing courts must avoid absurd results).
>
> In addition, "[i]t is a general rule in construing statutes that this Court will not only interpret the words used, but will consider the purpose and policy which the legislature had in view of enacting the law." *Kelly v. Int'l Games Tech., 874 So. 2d 977, 979 (Miss. 2004)* (quoting *Secretary of State v. Wiesenberg, 633 So. 2d 983, 990 (Miss. 1994))*; *see also Cucos, Inc. v. McDaniel, 938 So. 2d 238, 242 (Miss. 2006)* (Construction is "aided by looking to the function or the purpose of the rule.").

*Id*. 2007 U.S. District LEXIS 40267 (S.D. 2007).

If it is impossible for a member to consummate a Section 307(3) withdrawal, the policy of proscribing pre-dissolution withdrawal is rendered meaningless. Likewise, member dissociation, intended to cause insolvency and wrongful dissolution, affords no remedy to the LLC or its members, because it is deemed "impossible." *See e.g. Mississippi Gaming Comm'n. v. Imperial Palace of Mississippi*, 751 So.2d 1025, 1028 **8 (Miss. 1999) (courts have a duty "to support a construction which would purge the legislative purpose of any invalidity, absurdity or unjust inequality.")

- By her actions leading up separation from W&M, and under common law principles defining conflict of interests, McAlister is estopped from exercising authority or control over W&M.

- The Bankruptcy Court erred when it failed to find that McAlister breached (i) the duties placed on her by section 79-29-402(1)(a)(b)(c) of the LLC act; (ii) a fiduciary duty owed to W&M and Wyatt; and (iii) a duty of loyalty owed to W&M and Wyatt.

McAlister was a member-manager of W&M, at least before she severed her affiliation. As such she was subject to the statutory duties set forth in Section 79-29-402(1)(a)(b)(c) of the LLC Act. As illustrated in the "Statement of Relevant Facts," McAlister committed multiple, serious violations of the statutory standards of conduct placed on managers.

*Jackson & Miller*, 49.29 (citing Miss. Code § 79-29-302, which in pertinent part provides, addresses the duties of LLC managers, by stating:

> Managers, and in the case of member-managed LLC's, members are statutorily obligated to discharge their management duties in "good faith," with the care of an "ordinarily prudent person in a like position," in a manner reasonably believed to be in the best interests of the company.

*Jackson & Miller*, 49.30.

According to *Jackson & Miller*, and Mississippi case law interpreting the Ms LLC Act, when McAlister abruptly revoked funding for W&M causing its insolvency, repudiated the buy-out and name change agreement used to form and capitalize the firm, and converted and misappropriated its assets, she was not only subject to the statutory duties in Section 79-29-402(1)(a)(b)(c) placed on her as a member-manager, but also had a duty of loyalty "to act on the company's behalf, ahead of [her] personal interests." *Jackson & Miller*, 49.30; *see also*, *Kumar vs. Kumar, individually and as manager of Mit-Sar, L.L.C.*; *Mit-Sar L.L.C.*, 2009 U.S. Dist. LEXIS 26708, * 7 (N.D. Miss. March 31, 2009) [referring to the duty as a "fiduciary" duty, and citing *ERA Franchise Sys. v. Mathis*, 931 So.2d 1278, 1281 (Miss. 2006) and *Derouen v. Murray*, 604 So. 2d 1086, 1090-91 (Miss. 1992)].

*Jackson & Mille*r explain that the duty of loyalty, while not expressed in Miss. Code Ann. § 79-29-402(1)(a)(b)(c), is implied elsewhere in the Act and "by analogous common law duties established in corporate jurisprudence." *Jackson & Miller*, 49.30 [citing *Omni Bank v. United Southern Bank*, 607 So. 2d 76 (Miss. 1993); and *Ellzey v. Fyr-pruf, Inc.*, 376 So. 2d 1328 (Miss. 1979)]. The authors point to Section 79-29-110 as evidence that a duty of loyalty is implied. *Id*. This statute provides that indemnification of a member or manager is conditioned upon not personally benefitting from the alleged wrongdoing. *Id*. *Omni Bank* and *Fyr-Pruf*, *supra*, are bedrock cases defining the corporate duties of loyalty and fiduciary care under Mississippi law. Elaborating further on the duty of loyalty, *Jackson & Miller* state:

> A manager's duty of loyalty is essentially a duty to act on the company's behalf, ahead of the manager's personal interests. This duty is fiduciary in nature, and can arise in the area of self-dealing, whereupon a manager profits from transactions with the LLC, fails to fairly present business opportunities to the LLC, or uses of firm assets, which in effect may be an unauthorized compensation or distribution. A manager's competition with the LLC may also breach his or her duty of loyalty, even if the opportunity were unavailable to the LLC.

*Jackson & Miller*, § 49:30.

An important ruling with respect to Mississippi LLC law, the *Kumar* case has been cited extensively in briefs previously filed in this matter by W&M and Wyatt. *Kumar vs. Kumar, individually and as manager of Mit-Sar, L.L.C.*; *Mit-Sar L.L.C.*, 2009 U.S. Dist. LEXIS 26708, (N.D. Miss. March 31, 2009). In *Kumar*, a husband and wife formed Mit-Sar, a Mississippi LLC, and through Mit-Sar operated a Holiday Inn located in Columbus, Mississippi. Each were 50% owners in Mit-Sar, and although not required by an LLC operating agreement, both worked at the Holiday Inn.

After 25 years of marriage, Mrs. Kumar separated and filed for divorce. Mrs. Kumar moved to Atlanta and at some point thereafter became concerned that her former husband was mishandling LLC funds. After a demand to inspect books and records, Mrs. Kumar filed a complaint naming as defendants Mr. Kumar, individually and as manager of Mit-Sar, and Mit-Sar, the LLC.

The complaint included counts for breach of fiduciary duty and misappropriation and conversion of Mit-Sar assets and funds, and was bench-tried before Magistrate Judge David A. Sanders on December 9, 2008. The Magistrate Judge found that Mrs. Kumar's complaint was essentially a derivative action in that it alleged Mr. Kumar had breached a fiduciary duty to Mrs. Kumar *and to Mit-Sar. Id.* at * 7. (Italics added).

*Kumar* held that a fiduciary duty is owed "to Mit-Sar first and foremost and is only owed to Mrs. Kumar derivatively." *Id.* at * 7.  In *Kumar*, the Magistrate Judge cited *Derouen v. Murray*, a seminal case in Mississippi holding that in close corporations, shareholders owe each other a duty of fiduciary care. *Id.* at * 7 [citing *Derouen v. Murray*, 604 So. 2d 1086, 1090-91 (Miss. 1992)].  The *Kumar* Court applied the close corporation doctrine to Mit-Sar, a two member LLC, and relying on *ERA Franchise Sys. v. Mathis*, ruled that Mrs. Kumar's complaint may be treated as a direct action for individual recovery, provided certain conditions are met. *Id.* at * 7 [citing *ERA Franchise Sys. v. Mathis*, 931 So.2d 1278, 1281 (Miss. 2006) which in turn cites, *Derouen v. Murray*, 604 So. 2d 1086, 1090-91, n. 2 (Miss. 1992)].

The *Kumar* court recited the statutory duties required of a person in Mr. Kumar's position, i.e., a 50% member-manager, as those enumerated in Section 79-29-402(1)(a)(b)(c) of the Ms LLC Act, and held that Mr. Kumar "breached his fiduciary duty to Mrs. Kumar by taking a salary and making distributions to himself and his relatives without [Mrs. Kumar's] consent or knowledge following the parties' separation." *Id.* at * 7.

In addressing the conversion and misappropriation count asserted by Mrs. Kumar, the court held Mr. Kumar breached his fiduciary duty to Mrs. Kumar by paying distributions to himself and relatives without Mrs. Kumar's consent; using Mit-Sar funds to pay for personal expenses not related to Mit-Sar; and taking a salary without consent.  The court ruled the law applicable to closely-held corporations applied equally to Mit-Sar, making Mr. Kumar directly liable to Mrs. Kumar for the converted and misappropriated funds. *Id.* at * 8.

As in *Kumar*, both the law of fiduciary duty and the statutory duties enumerated in Section 79-29-402(1)(a)(b)(c) applied to McAlister when she dissociated or withdrew in violation of Section 79-29-307(3); repudiated the W&M buy-out and name change agreement for her own selfish reasons; terminated funding to force W&M into insolvency; converted and misappropriated W&M's Avandia case assets; unilaterally waived payment of an estimated $24,377.82 debt owed W&M under the buyout agreement; and altered W&M's accounting records by changing $75,000.00 of capital contributions to undocumented loans.

When on January 9, 2009, McAlister repudiated the buy-out and name change agreement upon which W&M was formed, she was a member-manager W&M, and at the same time, a member-manager of Nutt & McAlister.  Likewise, when McAlister separated from W&M, terminated its funding, and revoked the W&M buy-out agreement, all to force the LLC into insolvency and dissolution, she was a member-manager W&M, and at the same time, a member of an LLC intent upon divesting W&M and Wyatt of money, property and assets.  The conflict of interest created by McAlister's dual membership, is irreconcilable, and a forceful reason for applying estoppel in this case.

A similar conflict of interest created by dual affiliation, comparable in some respects to McAlister's actions in this case, arose in the 1973 case of *Home Telephone Company v. Darley et al*, 355 F. Supp 992 (N.D. Miss. 1973).

Home Telephone Company owned a certificate of convenience to provide dial telephone service to subscribers in Marshall and DeSoto counties, Mississippi.  *Id.* at * 11.  Home's common shares were owned by the Darley family of Tennessee, whose

leader was Lon Darley, Home's President and majority shareholder.  Serving in these capacities, Lon Darley "controlled and dictated the affairs of the company." Lon's son, Rex Darley, also common owned stock and served as an officer of Home. *Id.* at * 3-4.

Mid-Continent, a major telephone system in Hudson, Ohio, approached Home with a merger proposal.  Acting on Home's behalf, Lon Darley negotiated the merger agreement with Mid-Continent.  After the agreement was consummated, Clarke M. Williams, a Memphis resident "and person of large net worth," made an offer to Lon Darley to purchase Home's common stock for approximately $1,650,000 cash. Despite knowing that Home had committed to Mid-Continent under a merger agreement, Lon Darley countered that it would take $2,000,000 to purchase Home's common stock. Williams offered the $2,000,000 and delivered a cash payment of $100,000 to bind the transaction.  Darley accepted.  *Id.* at * 3-5.

Later, Lon Darley told Williams that he would have to get a legal opinion concerning the binding effect of Mid-Continent's merger agreement, and warned that Home might get sued if the agreement were breached.  Eventually, the Home stock was transferred to Union, a Mississippi company set up by Williams to own the Home stock. At the same time, Darley's son Rex executed a management agreement with an affiliate of Union, for a ten-year period at $18,000 annual salary. The agreement was later bought out for a lump sum payment of $90,000 to Rex Darley.  *Id.* at * 5.

Mid-Continent sued Home Telephone Company for wrongful breach of the merger agreement and was awarded $218,000 in damages.   *Mid-Continent*

*Telephone Corporation v. Home Telephone Company et al*, 319 F. Supp. 1176 (N.D. Miss. 1970). *Id.* at * 8-9.

The present suit by Home against Lon and Rex Darley, sought damages incurred by Home as a result of Lon Darley's and Rex Darley's actions as officers and persons in control of Home. The Mid-Continent suit resulted in a devaluation of Home's stock by 56%. *Id.* at * 10. The suit alleged that the Darleys owed a fiduciary duty to Home, which they violated "by causing Home to breach the merger agreement for no corporate business purpose and solely for their own personal gain," and were liable in tort "for causing Home to breach its contract with Mid-Continent in bad faith and without reasonable justification." *Id.* at * 11-12.

The Court applied the law in Mississippi applicable to officers and directors of a corporation. Citing the now famous *Knox Glass* case, and *Cooper v. Mississippi Land Co.*, the Court held that directors and officers "occupy a fiduciary relation to the corporation and to its stockholders." *Id.* at * 14, [citing *Knox Glass Bottle Co. v. Underwood,* 228 Miss. 699, 89 So.2d 799, 814 (1956); and *Cooper v. Mississippi Land Co.,* 220 So.2d 302 (Miss. 1969)]. Applying this duty to the Darleys' conduct, Judge William Keady stated:

> As such, an officer or director must act in accordance with the best interests of the corporation and by the strict standards of rectitude that bind a fiduciary; he is not entitled to use his position for personal gain where harm will befall the corporation, its creditors, or stockholders.

*Id.* at * 14.

By analogy to the common law of fiduciary duty, a member-manager in a LLC is likewise prohibited from using his position for personal gain where harm will

befall the LLC its creditors, or its members.  McAlister grossly violated both the letter and spirit of this fiduciary duty.  As a member-manager, McAlister was bound by both the statutory duties set forth in Miss. Code § 79-29-402(1)(a)(b)(c), and by analogy, the common law of fiduciary duty.  Furthermore, as a member-manager, McAlister was at all relevant times an agent of W&M, able to bind W&M.  Miss. Code § 79-29-303(1).   As an agent, McAlister potentially liable in tort for breaching the buy-out agreement in bad faith and without justification.  *See e.g.*, *Home Telephone, supra*, at * 18-19 (applying tort liability under agency law to a corporate officer who causes the breach of a contract in bad faith and without justification).

Under the law applied in *Home Telephone,* McAlister was prohibited from using her position for personal gain where harm will befall the creditors of W&M. This issue should raise eyebrows in a bankruptcy court, which by congressional mandate is charged with protecting the interests of creditors.  *See e.g., In re American Mariner Indus.*, 734 F.2d 426, 432 (9th Cir. Cal. 1984) (wherein the court stated: "[w]e are convinced, therefore, that the case-by-case development, guided by equitable principles as Congress envisioned, must recognize and protect the value of a creditor's interest when, as here, that value is demonstrated to exist and is measurably threatened.").

Recognizing the inherent conflict of interests posed by Lon and Rex Darleys' desire for personal gain, and in contrast, the "best interests" of a separate and distinct entity, Home Telephone Company, Judge William Keady held:

> There can be no doubt that by renouncing the contract with Mid-Continent the Darleys were acting solely for their personal gain. Home had no prospect of realizing any benefit whatever from the repudiation; its interests were not at all served by the price the

> Darleys got for their stock.  The breach was dictated only for the financial gain of the managing officers and their family."

*Id*. at * 15.

Comparing McAlister's actions to those of the principal actors in *Home Telephone*, it is worthwhile to take note of Judge Keady's comments:

> It plainly appears that when Lon and Rex Darley decided to repudiate the Mid-Continent agreement, they did so with full knowledge of the likely consequences.  They anticipated that litigation would probably be instituted by Mid-Continent; they knew that serious issues were raised in renouncing the contract and could ignore Mid-Continent's demands only at their peril; and they also knew that if Home was held liable, the damages recoverable by Mid-Continent might well jeopardize Home's solvency, or at least severely handicap its ability to carry on normal business operations. With matters in this posture, it was improvident for the Darleys to act as they did in complete disregard of Home's position.

*Id*. at * 16-17.

All that has been said about the Darleys' conduct in *Home Telephone*, is equally true of McAlister.  She knew that by repudiating the buy-out and name change agreement she was acting solely for her own personal gain.  She knew W&M had no prospect of realizing any benefit whatever from the repudiation and that its interests were not at all served her actions.  She knew the repudiation was dictated only for her own financial gain and as retaliation against Wyatt for requesting payment of past accrued fees improperly withheld.  She knew the consequences of repudiating the buy-out agreement and that litigation would likely result.   Finally, she knew and in fact intended that her actions would jeopardize the solvency of W&M.

Apart from the breach of fiduciary duty, a second ground of liability was

found to apply to the Darleys' conduct in *Home Telephone*.  In pertinent part the

opinion states:

> [. . .] liability for defaulting officers arises in tort where officers cause the corporation under their management and control to breach a contract with a third party in bad faith and without reasonable justification.  In such cases, liability rests upon the common law rule which imposes legal responsibility upon every agent who violates his authority or neglects his duty to the damage of his principal.  *19 Am.Jur.2d, Corporation, ß 1278*, p. 686.
>
> . . . .
>
> Applying this principle to the case sub judice, we find that Lon and Rex Darley could not possibly have believed that breaching the contract with Mid-Continent would serve Home's corporate interests; on the contrary, they knew that their actions would lead to serious litigation brought against Home with the prospect of great losses. The Darleys evinced no concern for Home's corporate welfare and utterly failed to explore steps which might be reasonably available to justify rescinding the merger agreement. Thus, we conclude that the defendants, by ignoring what was for Home's benefit and acting solely in their personal interest, were guilty of negligence; insofar as their principal -- Home -- was concerned, their acts in breaching the contract were in bad faith and without reasonable justification.

*Id*. at * 18-19.

As a matter of law, when McAlister negotiated the buy-out agreement for the

purpose of forming and capitalizing W&M, and then later, co-managed W&M while it

substantially performed the terms of the agreement, she was acting as a member-

manager of W&M and an agent of W&M, with full authority to bind W&M.  Miss.

Code § 79-29-303(1).  She cannot globally renounce her legal status and agency

relationship, and later claim that these actions were purely personal, and bear no

relation to W&M and its members.  Likewise, as a minority member and member-

manager of Nutt & McAlister, when McAlister both negotiated and agreed to the

buy-out and name change agreement, she was as a matter of law acting as an agent and member-manager of Nutt & McAlister, with full authority to bind Nutt & McAlister.[27]  Miss. Code § 79-29-303(1).

## CONCLUSION

The precedent set by the Bankruptcy Court in this case undermines and virtually destroys the purpose and policy legislative of the Ms LLC Act.  As such, the decision should be reversed.

This the 5th of January, 2011.

Respectfully submitted,

**DEREK A. WYATT**, an interested party filer and member-manager of WYATT & McALISTER, PLLC, appearing *pro se*,

By: /s/ Derek A. Wyatt, *pro se*
      Derek A. Wyatt, MSB No. 7413

OF COUNSEL:
**WYATT LAW PLLC**
102 Northlake Lane
Madison, MS 39110
Telephone (601) 954-1140
dwyatt@wyattlawpllc.com

---

[27] According to records on file with the Secretary of State, Nutt & McAlister has no operating agreement and its certificate of formation does not designate managers.  By operation of law, Nutt & McAlister was member-managed.  Miss. Code Ann. § 79-29-302.

## CERTIFICATE OF SERVICE

The undersigned counsel of record, Derek A. Wyatt, *pro se*, for interested party filer **DEREK A. WYATT**, hereby certifies that he has this served the above and foregoing on the following via the Court's ECF Notification System:

**Counsel for Wyatt & McAlister, PLLC:**

Vann F. Leonard, Esq. (MSB No. 9611)
578 Highland Colony Parkway, Suite 130
Post Office Box 16026
Jackson, MS  39236-6026
Telephone: (601) 978-1770
Email: vfllaw@bellsouth.net

**Counsel for Mary E. Krichbaum McAlister:**

Lawrence Allison, Esq.
Brunini Law Firm
190 East Captiol Street
P.O. Drawer 119
Jackson, MS 39205-0119
Telephone: (601) 960-6921
lallison@brunini.com

Joseph Sclafani,
Brunini Law Firm
190 East Captiol Street
P.O. Drawer 119
Jackson, MS 39205-0119
Telephone: (601) 960-6921
jsclafani@brunini.com

**Chapter 7 Trustee:**
Stephen Smith
5 Old River Place
Suite 107
Jackson, MS 39202-3449
Telephone:
trustee1@smithcpafirm.com

**Counsel for Chapter 7 Trustee:**

Eileen N. Shaffer, Esq.
401 East Capitol Street
P.O. Box 1177
Jackson, MS 39215-1177
Telephone: (601) 969-3006
enslaw@bellsouth.net

**Counsel for United States Trustee:**

Ronald H. McAlpin, Esq.
for R. Michael Bolen
100 W. Capitol St.
Suite 706
Jackson, MS 39269
Telephone: (601) 965-5241
ronald.mcalpin@usdoj.gov

THIS the 5th day of January, 2010.


By: /s/ Derek A. Wyatt, *pro se*
    Derek A. Wyatt, MSB No. 7413



DEREK A. WYATT, an interested party
filer, and manager-member of WYATT &
McALISTER, PLLC, in good standing;

BY:    s/ Derek A. Wyatt
       Derek A. Wyatt, *pro se*
       MSB No. 7413

Derek A. Wyatt, Esq.
MSB No. 7413